K–SWISS INC., a corporation Plaintiff,

v.

USA AISIQI SHOES INC., a California corporation; Me Lung Shoes Enterprises, Inc., a California corporation; Fu Chuen, Inc., a California corporation; and Li Peilian, an individual Defendants.

No. CV 03–5918 RJK.

United States District Court, C.D. California.

Sept. 29, 2003.

Frederick K. Taylor, Procopio Cory Hargreaves & Savitch, San Diego, CA, Neil D. Greenstein, Neil D. Greenstein Law Offices TechMark, San Jose, CA, for Plaintiff.

Natu J. Patel, Jason B. Witten, Wang & Patel, Newport Beach, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

KELLEHER, District Judge.

This Matter comes before the Court on Plaintiff's Application for a Preliminary Injunction against Defendants. After reviewing and considering the materials submitted by parties, the case file and oral argument, the Court **GRANTS** Plaintiff's application.

### I. BACKGROUND

This is a trademark infringement action brought by Plaintiff K–Swiss Inc. ("K–Swiss"). K–Swiss is a manufacturer of athletic shoes, and the owner of several trademark registrations that depict a "five stripe" design, a "toe box" design, and a "shield device" logo. These marks have been used in the K–Swiss "Classic" design shoe for over 25 years, as well as on other styles of K–Swiss shoes.

The "five stripe" design consists of five diagonal stripes on both sides of each shoe. (Plaintiff's Ex Parte Application ("Pl. Appl."), at 2–3.) The "toe box" design is a "side-by-side set of two rectangular, stitched patterns running longitudinally from the front tip of the outsole back towards the lacing area of the shoe." (*Id.*, at 3.) The "shield device" logo has five stripes in which the striping runs from the lower left to the upper right or to the upper left and contains block lettering in the top portion of the shield which reads "K–Swiss". (Plaintiff Supplemental Memorandum of Points and Authorities ("Pl. Supp."), at 3.)

K–Swiss claims that Defendants USA Aisiqi Shoes, Inc., Me Lung Shoes Enterprises, Inc., Fu Chuen, Inc., and Li Peilian (collectively, "Aisiqi") are selling counterfeits of K–Swiss shoes that bear the "five stripe", "toe box", and shield device marks.

On August 20, 2003, K–Swiss filed a complaint against Aisiqi, alleging statutory and common law claims for trademark infringement and counterfeiting, trade dress counterfeiting, unfair competition, dilution, and unfair and deceptive trade practice under state and federal law. The Court granted K–Swiss' application for a TRO which, inter alia, ordered the search and seizure of suspected counterfeit goods, records relating to those goods and the means of making them, and for inspection and inventory of other suspected counterfeits.

### II. DISCUSSION

#### A. Standard of Law

#### 1. Preliminary Injunction Standard

A plaintiff is entitled to a preliminary injunction in a trademark case when he demonstrates either "(1) a combination of 'probable success on the merits' and 'the possibility of irreparable injury' *or* (2) the existence of 'serious questions going to the merits' and that 'the balance of hardships tips sharply in his favor.'" *GoTo.com v. Walt Disney Company*, 202 F.3d 1199, 1204–1205 (9th Cir.2000) (emphasis added) (quoting *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir.1985)). Moreover, "[i]n a trademark infringement claim, irreparable injury may be presumed from a showing of likelihood of success on the merits." *Id.* at 1205 n. 4.

#### 2. Trademark Infringement under the Lanham Act

Sections 32 and 43 of the Lanham Act provide remedies against anyone who without consent uses any mark which is likely to cause confusion as to the origin, sponsorship or approval of certain goods by another person. 15 U.S.C. §§ 1114(1), 1125(a)(1).

To prevail on a claim under either section of the Lanham Act at the preliminary injunction stage, a plaintiff must establish: (1) the presence of a valid and

protectable trademark, and (2) the mark used by the Defendants presents a likelihood of confusion with Plaintiff's protectable mark. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1046, 1052 (9th Cir.1999).

## B. Analysis

### 1. The Validity of K–Swiss' Trademarks

■ K–Swiss' registration of its marks constitutes prima facie evidence of the validity of the registered marks and of K–Swiss' exclusive right to use the marks on the goods specified in the registration. 15 U.S.C. §§ 1057(b). Nevertheless, Aisiqi can rebut this presumption by showing that the K–Swiss marks are incapable of being protected under trademark law.

#### a. The Five Stripe Design

■ Aisiqi claims that K–Swiss' registered trademark in the five stripe design is subject to cancellation because it is a "functional" feature. Trademark protection extends only to product features that are nonfunctional. *Disc Golf Association v. Champion Discs, Inc.,* 158 F.3d 1002, 1006 (9th Cir.1998). A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Id.* (citations omitted).

■ To determine whether a product feature is functional, courts consider several factors: (1) whether the design yields a utilitarian advantage; (2) whether alternative designs are available; (3) whether advertising touts the utilitarian advantages of the design; and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *Disc Golf Association,* 158 F.3d at 1006. No one factor is dispositive; all should be weighed collectively. *International Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819, 823 (9th Cir.1993).

#### (i) Utilitarian Advantage

According to Aisiqi, the Five Stripes are a structural feature that (1) provide increased stabilization of the foot; (2) provide additional lateral and medial support for sudden cross court movements; and (3) reinforce the speed lacing eyelets, allowing greater form fitting and customize stabilization of the foot. (Aisiqi's Opposition ("Opp."), at 5–12.)

Expert declarations offered by K–Swiss support the conclusion that the five stripes provide no support or foot stabilization because the stripes are too thin and flexible to bear any weight or tension. (Declaration of Martyn Shorten in support of K–Swiss Application ("Shorten Decl."), at ¶ 11; Declaration of Joseph Skaya in support of K–Swiss Application ("Skaya Decl."), at ¶¶ 12–20.) Mr. Skaja stated that the sole source of reinforcement in the K–Swiss shoe is provided in the vamp area of the shoe. (Skaja Decl., at ¶ 20.) Tests performed by Dr. Shorten further demonstrate that the five stripes made essentially no difference in the lateral stability of the K–Swiss shoe. (Shorten Decl., at ¶¶ 18–20.) K–Swiss has properly demonstrated that the five stripe does not provide additional support or stabilization.

It is undisputed that the stripes serve to hold the D shaped eyelets ("D-rings") and assist in tight lacing (Nichols Decl., at ¶ 69). As discussed below, however, this factor alone does not render the stripes "functional" and, thus, unprotectable under trademark law.

#### (ii) Alternative Designs

Stripes may be placed on a shoe in a many other configurations. Moreover, "the loops, hooks, or eyelets can be attached to the base shoe material in a variety of other ways to produce the same effect as the D-rings with the stripes." (Skaja Decl. ¶ 21.) Thus, even if the stripes serve to hold the D-rings, this is

not a feature, the exclusive use of which "would put competitors at a significant non-reputation-related disadvantage." *Disc Golf Association,* 158 F.3d at 1006.

■ K–Swiss asserts that "no other athletic shoe regularly sold in the market . . . utilize the five stripe design." (Plaintiff's Reply ("Reply"), at 6; Reply Declaration of Steven B. Nichols In Support of OSC ("Nichols Reply Decl."), at ¶¶ 15–18.) As competitors routinely use alternative designs, this fact weighs in favor of K–Swiss' contention that the five stripe feature primarily is cosmetic and non-functional.[1]

### (iii) Advertising

■ "If a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality." J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:74 at 7–152 (4th ed.1998).

K–Swiss maintains that although its advertising features the five stripe Design, it does not suggest that the feature has any bearing on the performance of its shoes. (Reply, at 7.) Aisiqi presents no evidence suggesting otherwise. This factor, therefore, cuts in favor of non-functionality.

### (iv) Inexpensive Method of Manufacture

■ A functional benefit may arise if "the design achieves economies in manufacture or use." *International Jensen,* 4 F.3d at 823. K–Swiss asserts that the five stripe design adds significantly to the cost

of K–Swiss shoes, and has been retained only because it has come to be identified with K–Swiss. (Nichols Reply Decl., at ¶ 6.) No contradicting evidence has been provided by Aisiqi. Consequently, this factor weighs in favor of finding that the five stripe feature is non-functional.

### (v) Conclusion

The five stripe design is used as a source identification and is not a functional feature. Therefore, K–Swiss' trademark in the five stripe design is valid and protectable.

### b. The Toe Box Design

### (i) Utilitarian Advantage

■ Aisiqi contends that the toe box design is a functional feature because (1) it is reinforced with extra leather; (2) it is roomy, and thus allows room for the foot to expand during heavy athletic activity; (3) it prevents rapid wear of the toe region from "toe drag"; and (4) it allows greater lateral and medial motion control during athletic activity. (Opp., at 14–15.)

The subject of K–Swiss' registration is not the shape of the toe box or the fact that it contains a leather strip joining the two parts of the vamp, but rather the use of parallel heavy stitches on two side pieces in the area of the forefoot, creating a rectangular shape on either side of an underlying rectangular piece. (Declaration of Steven B. Nichols In Support of Ex Parte Application ("Nichols Decl."), at ¶ 9,

---

1. During oral argument, counsel for Defendants admitted a number of exhibits into evidence for the purpose of the preliminary injunction hearing. Defendants' Exhibit 6A is a Nike shoe on which the eyelets are held by five stripes on each side of the shoe. This, according to Defendants, indicates that competitors utilize the five stripe feature and will be disadvantaged in the quality of their products if they are precluded from using it. First, the five stripes on the Nike shoe do not resemble K–Swiss' trademark. The Nike stripes start at the lacing area and drop down about half way along each side of the shoe, at which point they become part of a material covering the rest of the shoe. This actually serves to support K–Swiss' argument, that eyelets can be held in many different noninfringing ways. Additionally, merely because one competitor uses a disputed feature, does not necessarily mean that the feature's function is so essential that competitors will be disadvantaged if precluded from using it.

Ex. 4.) K–Swiss' expert, Mr. Skaja, states in his declaration that there is no particular pattern of stitches that provides superior shoe or foot stability. (Skaja Decl., at ¶ 23.) Additionally, there is nothing to support Aisiqi's contention that the toe box design increases shoe durability. Accordingly, the stitching pattern and the underlying leather are not dictated by functional requirements.

### (ii) Alternative Designs

Stitching designs can take many different shapes and forms. Furthermore, even if there was a connection between K–Swiss' toe box design and the shape of the toe box area, a roomy toe box can be accomplished in a variety of ways, and does not necessitate the use of K–Swiss' toe box design. Accordingly, this factor weighs in favor of non-functionality.

### (iii) Advertising

K–Swiss maintains that although its advertising features the toe box design, it does not cite that feature as a performance enhancing feature, but rather as an indicator that K–Swiss is the source of the shoe. (Reply, at 9; Nichols Reply Decl., at ¶ 9.) Aisiqi presents no evidence suggesting otherwise. This factor, therefore, cuts in favor of non-functionality.

### (iv) Inexpensive Method of Manufacture

The parallel stitching in the K–Swiss toe box is more expensive than alternative toe box designs (Skaja Decl., at ¶ 23; Nichols Reply Decl., at ¶ 9,) and, thus, this factor tips the scale in favor of finding non-functionality.

### (v) Conclusion

Based on the foregoing analysis, the Court concludes that the toe box design is used to identify K–Swiss as a source of the shoe and is not a functional feature. Therefore, K–Swiss' trademark in the toe box design is valid.

### 2. Likelihood of Confusion

Having concluded that K–Swiss' trademarks are valid, the Court next turns to whether likelihood of confusion has been shown. Courts look to the following factors for guidance: (1) similarity of the marks; (2) relatedness of the goods; (3) strength of the mark; (4) marketing channel used; (5) degree of care likely to be exercised by purchaser; (6) defendant's intent on selecting the mark; (7) evidence of actual confusion; (8) likelihood of expansion of the product lines. *AMF v. Sleekcraft Boats*, 599 F.2d 341, 348–349 (9th Cir.1979). "[T]he relative importance of each factor will be case-specific ... [and] it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield*, 174 F.3d at 1054. Each of the *Sleekcraft* factors is discussed below.

### a. Similarity of The Marks

The more similar the marks in terms of appearance, the greater the likelihood of confusion. *Brookfield*, 174 F.3d at 1054. Furthermore, where marks are *virtually identical*, "if they were used with identical products or services likelihood of confusion would follow as a matter of course." *Id.*, at 1056.

Aisiqi's shoes bear features similar to the five stripe design, the toe box design and the shield device. Aisiqi does not argue that the marks used are not similar. (Opp., at 27.) This factor weighs in favor of finding likelihood of confusion.

### b. Relatedness of The Goods

Where goods are related or complementary, the danger of consumer confusion is heightened. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.1992). To be related, goods do not have to be identical. *Sleekcraft*, 599 F.2d at 350.

Both Aisiqi's and K–Swiss' products are tennis shoes. Because the goods are related, there is a greater risk that the public will be confused by a similar mark.

### c. Strength of The Marks

■■■ Marks are categorized, in order of decreasing distinctiveness, as follows: (1) arbitrary or fanciful, (2) suggestive, (3) descriptive or (4) generic. *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes*, 616 F.2d 440, 445 (9th Cir.1980). "A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses. A descriptive mark tells something about the product; it will be protected only when secondary meaning is shown." *Sleekcraft*, 599 F.2d at 349 (citations omitted). Suggestive marks "subtly connote something about the product" associated with the mark and, "although less distinctive than an arbitrary or fanciful mark" and therefore weak in comparison to such a mark, "a suggestive mark will be protected without proof of secondary meaning." *Id.* (citations omitted).

■■■ Aisiqi does not claim that the marks are suggestive or descriptive. Instead, it argues that the stripes and shields are commonplace marks, and, thus, are only entitled to weak protection. (Opp. at 25; Trope Declaration In Support Of Defendants Opposition ("Trope Decl."), Exs. 2–5.) However, K–Swiss' trademark is for five diagonal stripes on both sides of each shoe, rather than for any number or arrangement of stripes. Similarly, the shield device trademark has five diagonal lines across the shield and block lettering in the upper part of the shield. Marks with those specific characteristics cannot be said to be so pervasive in the tennis shoe industry that they are "weak".

■■■ Furthermore, even inherently weak marks can be strengthened by the acquisition of secondary meaning. A mark has acquired secondary meaning if consumers think uniquely of the mark owner or his product when they see the trademark. *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir.1987).

■■■ K–Swiss five stripe design and shield device are widely known and acknowledged throughout the industry. (Supplemental Declaration of Steven B. Nichols ("Nichols Supp. Decl."), at ¶¶ 4–5.) Consumers look to those marks to identify K–Swiss as the source of the shoes. (Nichols Decl., at ¶ 13.) Consequently, the marks have acquired secondary meaning and, therefore, are entitled to trademark protection. The strength of the marks weighs in favor of K–Swiss' claim that consumers' confusion is likely.

### d. Marketing Channels Used

Aisiqi claims that while K–Swiss shoes are typically carried at specialty tennis stores or high-end department stores and tend to be priced between $50–$100 per pair, "Air Bag" shoes are marketed in discount shoe stores at approximately $20 a pair. Aisiqi concludes that because "Air Bag" shoes will "never be viewed on the same shelf" as K–Swiss shoes (Opp., at 26, 28) consumers' confusion is unlikely. K–Swiss, on the other hand, claims that its shoes appear in numerous general retail outlets, not only in high-end stores. (Reply, at 15.) Even if Aisiqi's contention is correct, the difference in the marketing channels used is not so large that it significantly reduces the risk of confusion. The similarity of the marks still may lead consumers to believe that K–Swiss has created its own "value" line of shoes sold in discount shoe stores.

■■■ Furthermore, "post-purchase confusion," *i.e.*, confusion on the part of someone other than the purchaser who sees the item after it has been purchased, is sufficient to establish the required likelihood of

confusion under the Lanham Act. *Karl Storz Endoscopy–America, Inc.*, 285 F.3d at 854 (citations omitted). Post-purchaser confusion is likely to occur in this case despite the fact that the price ranges and types of stores that sell the shoes are dissimilar.

### e. Degree of Care Likely To Be Exercised By Purchaser

Athletic shoes are common consumer items and often are purchased several times a year. A reasonable consumer, therefore, is unlikely to exercise a high degree of care in selecting shoes. Notwithstanding Aisiqi's claim that the dissimilar price range is likely to make purchasers aware that the origin of the shoes is not K–Swiss, purchasers may assume that Aisiqi's shoes are low-end lines produced by K–Swiss. This factor, therefore, weighs in favor of finding confusion likely.

### f. Defendant's Intent In Selecting The Mark

■ While "an intent to confuse consumers is not required for a finding of trademark infringement," *Brookfield*, 174 F.3d at 1059, "intent to deceive is strong evidence of a likelihood of confusion," *Interstellar Starship Servs., Ltd. v. Epix*, 184 F.3d 1107, 1111 (9th Cir.1999).

In the present case, an inference may be drawn from K–Swiss' strong reputation and the similarity of the marks used. Moreover, the fact that Aisiqi's shoes bear more than one of K–Swiss' marks and resemble the overall appearance of the K–Swiss shoes, including features that are not protected under trademark law (*see* section 3 below) further indicates an intent to deceive the public as to the origin of the shoes. This factor weighs in favor of finding likelihood of confusion.

### g. Evidence of Actual Confusion And Likelihood of Expansion of The Product Lines

The parties concede that these two factors are irrelevant in this case.

### h. Conclusion

Based on the Court's analysis of the *Sleekcraft* factors, it appears that given Aisiqi's use of K–Swiss' marks, **consumers are likely to be confused** as to the origin of Aisiqi's shoes and could mistakenly associate them with K–Swiss. Because likelihood of confusion is the primary test for trademark infringement, K–Swiss has successfully demonstrated that it is likely to succeed on the merits of the case. Thus, a **preliminary injunction is warranted.**

### 3. Trade Dress Protection

■ The application for preliminary injunction is also based on a claim for trade dress infringement. "[T]rade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen*, 4 F.3d at 822 (internal quotation marks and citation omitted). Accordingly, trade dress affords a broader protection and includes features, other than those protected under trademark law. The analysis for determining whether a trade dress is protected under section 43(a) of the Lanham Act is essentially the same as the trademark infringement analysis, and centers around a finding of "likelihood of confusion". *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *International Jensen*, 4 F.3d at 823.

■ According to K–Swiss, Aisiqi's shoes mimic K–Swiss' "Classic" and "Nido" design trade dress by utilizing confusingly similar features. Specifically, Aisiqi's shoes employ the use of D-rings,

which K–Swiss alleges it has used for years; Aisiqi's trade name "Air Bag" appears in the exact same location on the shoe as where K–Swiss places its trade name; Aisiqi's shoes bear a device connecting the tongue to the shoe so that the tongue is "reversible" ("reversible tongue").[2] (Pl Appl., at 4–5.)

The overall appearance of Aisiqi's shoes is very similar to that of K–Swiss' and is likely to cause consumers' confusion for the same reasons this Court found likelihood of confusion with respect to the trademark violations.[3]

 Aisiqi claims that because its packaging is different from that of K–Swiss, consumer's confusion is unlikely. (*See* Trope Decl., Ex. 1.) As the Ninth Circuit stated in *TrafFix Devices:* "[t]he design or packaging of a product ... serves to identify the product with its manufacturer or source; and ... is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 28, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (emphasis added). Therefore, for trade dress violation to arise, it is not required that both the goods and their packaging cause confusion. Fur-

thermore, post-purchase confusion is likely notwithstanding the dissimilar packaging. Consequently, K–Swiss shoes are entitled to trade dress protection.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** K–Swiss' application for a preliminary injunction. The Court will enter a separate order regarding the terms of the preliminary injunction.

---

2. Aisiqi also contends that the "reversible tongue" feature cannot be protected as a trade dress because it is a functional feature. Aisiqi also points to the fact that this feature is patented. (Opp., at 30–32.) The "reversible tongue" is only one element on the overall appearance of the shoe. "The fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress." *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1259 (9th Cir. 2001) (citations and quotation marks omitted). Therefore, K–Swiss designs are entitled to trade dress protection even though they include an arguably functional feature.

3. Aisiqi sells three styles of shoes which K–Swiss claims are infringing. The first style, and arguably the most egregious imitation, bears the following features: (1) the five stripe design; (2) the toe box design; (3) D-rings at the end of the stripes; (4) piping on the stripes; (5) five perforation holes in the center of the toe box; (6) a trade name on the lateral side of the toe box area; and (7) reversible tongue. The second style has: (1) four stripes instead of five, set in a similar format; (2) D-rings at the end of the stripes; (3) the toe box design; (4) a trade name on the lateral side of the toe box area; and (5) reversible tongue. The third style of Aisiqi's shoes includes (1) five stripes; and (2) metal D-rings. (Pl. Appl., at 4–5.)