**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MIKE ZEYEN; OLIVIA ZEYEN; RACHAEL BOOTH; KIM A WOOD, | No. 23-35438 |
| *Plaintiffs-Appellants*, | D.C. No. 1:18-cv-00207-RCT |
| LOGAN JONES; PEYTON JONES; AMY WEBER; KRISTAL CRIDER; DEAN CRIDER; NICK DELGADO; ASHLEY DELGADO, | OPINION |
| *Appellants*, | |
| v. | |
| BONNEVILLE JOINT DISTRICT, # 93; POCATELLO/CHUBBUCK DISTRICT, # 25; WEST ADA SCHOOL DISTRICT, # 2, | |
| *Defendants-Appellees*, | |
| and | |
| BOISE DISTRICT, # 1; ABERDEEN DISTRICT, # 58; ACADEMY AT ROOSEVELT CENTER, # 460; ALTURAS INTERNATIONAL | |

ACADEMY LEA, # 495;
AMERICAN FALLS JOINT
DISTRICT, # 381; AMERICAN
FALLS JOINT DISTRICT, # 476;
ANOTHER CHOICE VIRTUAL
CHARTER SCHOOL LEA, # 476;
ANSER CHARTER SCHOOL BOISE
SD, # 1; ARBON ELEMENTARY
DISTRICT, # 383; ARTEC
CHARTER SCHOOL MINIDOKA
SD, # 331; AVERY DISTRICT, #
394; BASIN DISTRICT, # 72; BEAR
LAKE COUNTY DISTRICT, # 33;
BINGHAM ACADEMY
BLACKFOOT, ID LEA, # 485;
BLACKFOOT DISTRICT, # 55;
BLACKFOOT CHARTER
COMMUNITY LEARNING
CENTER LEA, # 477; BLAINE
COUNTY DISTRICT, # 61; BLISS
DISTRICT, # 234; BOUNDARY
COUNTY DISTRICT, # 101;
BRUNEAU-GRAND VIEW JOINT
SCHOOL DISTRICT, # 365; BUHL
JOINT DISTRICT, # 412; BUTTE
COUNTY DISTRICT, # 111;
CALDWELL DISTRICT, # 132;
CAMAS COUNTY DISTRICT, #
121; CAMBRIDGE, # 432;
CANYON-OWHYEE SCHOOL
SERVICE AGENCY, # 555;
CASCADE DISTRICT, # 422;
CASSIA JOINT DISTRICT, # 151;

CHALLIS JOINT DISTRICT, # 181; CHIEF TARGHEE ELEMENTARY ACADEMY LEA, # 483; CLARK COUNTY DISTRICT, # 161; COEUR DALENE CHARTER ACADEMY LEA, # 491; COEUR D'ALENE DISTRICT, # 271; COMPASS PUBLIC CHARTER SCHOOL LEA, # 455; CONNOR ACADEMY PUBLIC CHARTER SCHOOL LEA, # 460; CONNECTIONS ACADEMY, # 457; COTTONWOOD JOINT DISTRICT, # 242; COUNCIL DISTRICT, # 13; CULDESAC JOINT DISTRICT, # 342; DIETRICH DISTRICT, # 314; EMMETT INDEPENDENT DISTRICT, # 221; FALCON RIDGE PUBLIC CHARTER SCHOOL, # 456; FILER DISTRICT, # 413; FIRTH DISTRICT, # 59; FORREST M. BIRD CHARTER SCHOOL LEA, # 487; FREMONT COUNTY JOINT DISTRICT, # 215; GARDEN VALLEY DISTRICT, # 71; GEM PREP: NAMPA NAMPA SD, # 131; GEM PREP: POCATELLO IDEA LEA, # 490; GENESEE JOINT DISTRICT, # 282; GLENNS FERRY DISTRICT, # 192; GOODING JOINT DISTRICT, # 231; GRACE JOINT DISTRICT, # 148; HAGERMAN DISTRICT, # 233; HANSEN DISTRICT, # 415;

HERITAGE ACADEMY LEA, # 479;
HERITAGE COMMUNITY
CHARTER SCHOOL LEA, # 481;
HIGHLAND DISTRICT, # 305;
HOMEDALE JOINT DISTRICT, #
370; HORSESHOE BEND SCHOOL
DISTRICT, # 73; IDAHO ARTS
CHARTER SCHOOL NAMPA, #
131; IDAHO DISTANCE
EDUCATION ACADEMY (I-DEA)
LEA, # 490; IDAHO
EDUCATIONAL SERVICES FOR
THE DEAF AND THE BLIND, #
596; IDAHO FALLS DISTRICT, #
91; IDAHO SCIENCE &
TECHNOLOGY CHARTER
SCHOOL LEA, # 468; IDAHO
TECHNICAL AND CAREER
ACADEMY LEA, # 489; IDAHO
VIRTUAL ACADEMY LEA, # 452;
INSPIRE CONNECTIONS
ACADEMY LEA, # 457; ISUCCEED
VIRTUAL HIGH SCHOOL LEA, #
466,

*Defendants*.

Appeal from the United States District Court
for the District of Idaho
Richard C. Tallman, Circuit Judge, Presiding

Argued and Submitted May 9, 2024
Seattle, Washington

Filed August 23, 2024

Before:  Mary H. Murguia, Chief Judge, and M. Margaret McKeown and John B. Owens, Circuit Judges.

Opinion by Chief Judge Murguia

## SUMMARY[*]

### Takings Clause / Law of the Case Doctrine

The panel affirmed the district court's summary judgment in favor of several Idaho public school districts in a 42 U.S.C. § 1983 action brought by parents of Idaho school children who seek reimbursement for fees associated with educational and extracurricular opportunities within Idaho public school districts.

Plaintiffs alleged such fees were improperly assessed because the Idaho Constitution requires that the Idaho Legislature provide "free common schools" and that the payment of such fees constitutes a taking of property without due process in violation of the Takings Clause of the Fifth Amendment.  The panel held that the Idaho Constitution does not give rise to a vested private property interest in specific educational benefits and that money paid to satisfy fees related to supplemental educational services is therefore not properly the subject of a Takings Clause claim.  A public education in Idaho lacks the essential "bundle" of private

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

property characteristics because neither students nor their parents can possess, use, dispose of, or sell their interest in free public education in Idaho, which means that an interest in a free public education is not sufficiently vested to be subject to the Takings Clause.

The panel also clarified that pursuant to the law of the case doctrine, a second district judge should not reconsider the ruling of a prior district judge in the same case unless: (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial. Here, although the second district judge revisited the first district judge's prior ruling without making the requisite findings, any procedural error was harmless because the second district judge's decision on the merits of the summary judgment motion under the Takings Clause was correct.

## COUNSEL

T. Jason Wood (argued), Wood Law Group PC, Idaho Falls, Idaho; Robert C. Huntley, R. Huntley Law PLLC, Boise, Idaho; for Plaintiffs-Appellants.

James R. Stoll (argued) and Brian K. Julian, Anderson Julian & Hull LLP, Boise, Idaho; for Defendants-Appellees.

# OPINION

MURGUIA, Chief Circuit Judge:

Plaintiffs-Appellants ("Appellants") are parents of Idaho school children who seek reimbursement for fees associated with educational opportunities within public school districts in Idaho. They allege such fees were improperly assessed because the Idaho Constitution requires that the Idaho Legislature provide "free common schools" and that the payment of such fees constitutes a taking of property without due process in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution. But we find that the Idaho Constitution does not give rise to a vested private property interest in specific educational benefits and that money paid to satisfy fees related to supplemental educational services is therefore not properly the subject of a Takings Clause claim.

Today we also clarify the standard district courts must apply before reconsidering a predecessor judge's prior ruling. While we find that the district judge here revisited the previous judge's prior ruling without making one of the two requisite findings, his ultimate decision to grant summary judgement to the Defendants-Appellees (the "School Districts") was correct. We therefore affirm.

## I

In May 2018, Appellants filed a complaint under 42 U.S.C. § 1983, alleging violations of the Takings Clause and the Due Process Clause. The case was assigned to Judge B. Lynn Winmill ("the first district judge"). Through this lawsuit, Appellants seek to recover fees paid in connection with certain educational and extracurricular opportunities

and to obtain a declaratory judgment that prohibits the imposition of such fees in the future. Appellants initially attempted to obtain class certification and proceed on behalf of all students and parents in 115 school districts and charter schools in Idaho, but that class certification request was denied. On appeal, three Appellants remain: Rachael Booth, Kim Wood, and Mike Zeyen. Of those, only two paid fees within the applicable two-year statute of limitations.[1]

Kim Wood is the guardian *ad litem* of Peyton Jones, who was enrolled in Bonneville Joint District from 2015-2019.[2] Kim Wood alleges she was charged the following fees:

- $10 during the 2018-19 school year for Early Childhood Development, a specialized, optional course for students who wish to enroll in it. The fee covered the cost for special class supplies.

- $32 during the 2018-19 school year for HOSA Store. "HOSA" stands for Health Occupations Student Association. This is an optional fee, and it covers the direct cost of items purchased.

- $10 during the 2018-19 school year for HOSA CPR Card. This is an optional fee for students who wish

---

[1] Rachael Booth is the parent and guardian *ad litem* of M.B., who was enrolled in Pocatello/Chubbuck School District from 2015-2018. Each of the fees paid on behalf of M.B. were paid outside the statute of limitations.

[2] Kim Wood is also the parent and guardian *ad litem* of Logan Jones, who was enrolled in Bonneville Joint District from 2013-2016. The fees paid on behalf of Logan Jones were paid outside the applicable two-year statute of limitations.

to participate in a CPR class, and covers the optional cost of certification cards.

- $4 during the 2016-17, 2017-18, and 2018-19 school years for lockers.  Locker use at the district is optional.  The fee covers locker maintenance and repair and is only charged to students who wish to purchase a locker.

- $10 for Aerobics during the 2016-17 school year. Aerobics is optional, and the fee is only charged to students who enroll in the class.  The fee is used to offset the cost of guest instructors and special course-related activities.

Mike Zeyen is the parent and guardian *ad litem* of Olivia Zeyen, who was enrolled at Pocatello/Chubbuck School District from 2015-2017. Mike Zeyen alleges he was charged the following fees:

- $105 during the 2016-17 school year for PAR 1-Band (Participation 1).  This is optional for students who wish to participate in Band beyond the classroom, and the fee covers the cost for travel.

- $111 during the 2017-18 school year for Band.  This fee was for an optional Band Spirit Pack which included equipment, a personal instructor, travel, band camp, a t-shirt, and food for travel. The balance for this fee is outstanding, which means it was never paid.

- $15 during the 2016-17 school year for Band Uniform Cleaning.  This is an optional fee for students in Band who choose to travel and perform with the Band using school uniforms, and the fee

covers the cost of professionally cleaning the Band uniforms.

- $300 during the 2019-20 school year for Pharma Tech Course. This is an optional career/technical education course, and the fee is a pass-through fee to directly cover the cost of Pharma Technician Certification.

The School Districts moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The first district judge granted the motion in part.

Subsequently, the parties filed cross motions for summary judgment. As relevant here, the School Districts moved for summary judgment, arguing that Appellants had no property right to a free education to which the Takings Clause could attach and, relatedly, that the Idaho Legislature had not provided a cause of action for the alleged violations of Idaho's Constitution. In February 2021, the first district judge denied the School Districts' motion, concluding that Appellants have a property interest in a free education under the Idaho Constitution. In so doing, the first district judge rejected the School Districts' arguments that the fees should be construed as taxes not subject to the Takings Clause and that Appellants were provided just compensation in the form of educational benefits. The School Districts moved for reconsideration, arguing that Appellants did not possess a property interest protected by the Takings Clause. The first district judge denied the motion by written order in July 2021.

In January 2022, the case was reassigned to Judge Richard C. Tallman, sitting by designation ("the second district judge"). In a September 2022 scheduling order, the

second district judge wrote, "It is unclear to this Court how a violation of the Federal Constitution would result from a violation of Article IX, § 1 of the Idaho Constitution." Accordingly, the second district judge *sua sponte* invited the parties to brief the Takings Clause issue again, indicating that the "parties may file dispositive motions by December 22, 2022."

The School Districts filed a second motion for summary judgment. Regarding the merits of Appellants' claims, the School Districts argued the remaining fees assessed do not violate the Idaho Constitution's right to a free education and therefore do not offend the Takings Clause of the federal Constitution. The School Districts also argued the fees do not implicate property rights protected by the federal Due Process Clause. Instead, they argued that Appellants' claims arose out of extracurricular educational opportunities that are optional and extend beyond the minimum free education guaranteed by the Idaho Constitution. Finally, the School Districts reasserted that Appellants have no statutory cause of action under Idaho law. Three Appellants opposed summary judgment, arguing that they had not forfeited claims to certain categories of fees and that any fee arising out of a standard academic curriculum with credit towards graduation, regardless of its elective nature, implicates Idaho's guarantee of a free education.

The second district judge granted the School Districts' second motion for summary judgment. He first noted his disagreement that he was bound by the first district judge's prior determination on the basis that the "earlier ruling [wa]s not supported by caselaw." The second district judge concluded that Appellants do not possess a property right protected by the Takings Clause because, among other reasons, Appellants' entitlement to a free education

resembles a public right, not a vested private property right. The second district judge also concluded that Appellants had failed to plausibly allege a due process violation.

Appellants filed a timely notice of appeal, and this appeal follows.

## II

"We review for abuse of discretion a district judge's decision to reconsider an interlocutory order by another judge of the same court." *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001) (citation omitted).

A grant of summary judgment is reviewed de novo. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). "We determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002) (citing *Clicks Billiards, Inc.*, 251 F.3d at 1257). "[W]e may affirm the district court's grant of summary judgment on any ground supported by the record." *Cruz v. Nat'l Steel & Shipbuilding Co.*, 910 F.3d 1263, 1270 (9th Cir. 2018).

## III

### A

We must first consider whether the second district judge was justified in reconsidering the first district judge's prior interlocutory order. "The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (citations and internal

quotation marks omitted). This doctrine was "founded upon the sound public policy that litigation must come to an end," and serves many purposes including "aid[ing] in the efficient operation of court affairs" and "advanc[ing] the principle that in order to maintain consistency during the course of a single lawsuit, reconsideration of legal questions previously decided should be avoided." *United States v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004) (per curiam) (internal citations and quotation marks omitted).

The law of the case doctrine serves additional purposes when a new district judge is assigned to the case and is asked to reconsider the former judge's decision. Among other things, "the doctrine increases confidence in the adjudicatory process: reconsideration of previously litigated issues, absent strong justification, spawns inconsistency and threatens the reputation of the judicial system." *Ellis v. United States*, 313 F.3d 636, 647 (1st Cir. 2002) (citing Geoffrey C. Hazard, Jr., *Preclusion as to Issues of Law: The Legal System's Interest,* 70 Iowa L. Rev. 81, 88 (1984) (collecting cases)). Furthermore, "judges who too liberally second-guess their co-equals effectively usurp the appellate function and embolden litigants to engage in judge-shopping and similar forms of arbitrage." *Id*. (citing *United States v. Erwin*, 155 F.3d 818, 825 (6th Cir. 1998)).

Consistent with this principle, "judges who sit in the same court should not attempt to overrule the decisions of each other." *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 379 (9th Cir. 1960) (citation and quotation marks omitted). As one district judge has noted, the issue of reconsidering a decision of a different judge of the same court is a complicated one: "It is assuredly more likely that two judges will see an issue differently than it is that the same judge will see the same issue differently across time."

*Baldwin v. United States*, 823 F. Supp. 2d 1087, 1099 (D. N. Mar. I. 2011). Accordingly, when faced with such a situation, judges must—in light of the overarching "principles of comity and uniformity"—make every effort "'to preserve the orderly functioning of the judicial process.'" *Castner*, 278 F.2d at 379–80 (quoting *T.C.F. Film Corp. v. Gourley*, 240 F.2d 711, 714 (3d Cir. 1957)); *accord Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 530 (9th Cir. 2000).

As many district courts within the Ninth Circuit have indicated over the past decade, "the standard to apply when one judge is asked to reconsider another's order in the same case is not entirely clear." *Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*, No. 2:13-CV-02095-KJM-AC, 2016 WL 4717986, at *9 (E.D. Cal. June 10, 2016); *see also Baldwin*, 823 F. Supp. 2d at 1099; *Fox v. De Long*, No. 2:14-CV-02947-KJM, 2016 WL 6088371, at *7 (E.D. Cal. Jan. 8, 2016) ("In this Circuit, case law is inconsistent as to the standard that applies when one judge must decide whether to reconsider another's order in the same case."). Among Ninth Circuit cases applying the law of the case doctrine in this situation, two main standards have been set forth.[3]

In *Castner*, we explained that in order for the second judge to "conscientiously carry out his judicial function in a case over which he is presiding," he may not "permit[] what he believes to be a prior erroneous ruling to control the case." 278 F.2d at 380. Accordingly, we concluded that a district

---

[3] Separately, this Court has also expressed some uncertainty regarding the applicability of the law of the case doctrine at all in circumstances where a later-assigned district judge seeks to revisit a ruling by the previously-assigned district judge. *See Mark H. v. Lemahieu*, 513 F.3d 922, 932 n.8 (9th Cir. 2008).

judge may review an order of a prior judge in the same case for "cogent reasons and exceptional circumstances." *Id.* Later, in *Delta Savings Bank*, we explained that the law of the case doctrine limited a judge's discretion to review the decision of a predecessor in the same case. 265 F.3d at 1027. More specifically, we held that "[t]he prior decision should be followed unless: (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Id.* (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997)). We have subsequently applied both the *Castner* and *Delta Savings Bank* standards in three unpublished dispositions, but have done so inconsistently. *See Hartford Fire Ins. v. Wasser High-Tech Coatings, Inc.*, 44 F. App'x 219, 220–21 (9th Cir. 2002) (applying both the *Castner* standard and the *Delta Savings Bank* standard together); *EEOC v. Serrano's Mexican Rests., LLC*, 306 F. App'x 406, 407 (9th Cir. 2009) (focusing on the *Castner* standard while also citing *Delta Savings Bank*, but not referencing the three grounds for reconsideration articulated in that case); *Offutt v. Georgia-Pac. Gypsum LLC*, No. 21-35624, 2022 WL 1955740, at *1 (9th Cir. June 6, 2022) (focusing on the *Delta Savings Bank* standard).

We now resolve the uncertainty surrounding the question of when a district judge may review an interlocutory order by a prior judge in the same case and hold that the *Delta Savings Bank* standard governs. A second district judge should not reconsider the ruling of a predecessor unless: "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a

subsequent trial." *Delta Sav. Bank*, 265 F.3d at 1027 (citation omitted).

As we have now clarified, absent other circumstances not present here, the *Delta Savings Bank* standard requires that the previous decision be both clearly erroneous *and* that its enforcement would work a manifest injustice before a second judge can justify revisiting the previous decision. *Id.* Here, we find that the second district judge satisfied the "clearly erroneous" prong of *Delta Savings Bank*, but— understandably so given the confusion in this area of law— he did not make the requisite "manifest injustice" finding before reconsidering the first district judge's decision.

In his summary judgment order, the second district judge noted that he disagreed that he was bound by the first district judge's prior decision because "application of the [law of the case] doctrine is discretionary" and "[a]ll rulings of a trial court are subject to revision at any time before the entry of judgment." The second district judge cited Ninth Circuit caselaw holding that "trial courts 'unquestionably possess' the ability to sua sponte grant summary judgment after providing notice and opportunity to the parties" and indicated that he had given the parties notice through his scheduling order. "Having researched the matter fully," the second district judge "believe[d] [the first district judge's] earlier ruling is not supported by caselaw."

The second district judge's "not supported by caselaw" statement is arguably sufficient to satisfy the "clearly erroneous" prong of the *Delta Savings Bank* standard, especially given the then-existing uncertainty regarding the standard we clarify today. *Duarte Nursery*, 2016 WL 4717986, at *9–13 (examining the predecessor judge's flawed interpretation of precedent and ultimately finding

"the prior decision in this respect clearly erroneous"). But before reconsidering a previous judge's order, a district judge must also conclude that enforcement of the previous decision "would work a manifest injustice." *Delta Sav. Bank*, 265 F.3d at 1027. We conclude that the second district judge did not make such a finding.[4]

Going forward, we emphasize that when deciding whether to revisit a previous decision by a predecessor judge, district judges should explicitly consider whether any of the three circumstances laid out in *Delta Savings Bank* are applicable before proceeding to reconsider a prior order issued by a previous judge. In cases like this one that do not involve an intervening change in law or new evidence adduced during the course of the litigation, this analysis must include an explanation of (1) why the previous decision is "clearly erroneous"; and (2) why enforcement of the previous decision "would work a manifest injustice." *Delta Sav. Bank*, 265 F.3d at 1027. The "clearly erroneous" analysis could, for example, identify the portions of the predecessor judge's analysis that the district judge believes are incorrect, or explain why the cases the predecessor cited are not controlling or distinguishable. The "manifest injustice" analysis should specifically indicate what injustice would occur if the previous decision were allowed to stand. Engaging in this analysis is important to ensure that district judges do not revisit orders without sufficient justification.

In any case, however, "whether or not a district court judge abuses his discretion by reversing an earlier judge's ruling, the Court of Appeals should review the merits of the

---

[4] We also do not think the second district judge's rationale satisfies *Castner*'s "exceptional circumstances" requirement, if the second judge were applying that standard.

ruling." *Delta Sav. Bank*, 265 F.3d at 1027–28 (citing *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993)). Accordingly, we now proceed to consider the merits of the summary judgment ruling. As explained in detail below, the second district judge's decision on the merits of the summary judgment motion under the Takings Clause was correct. Therefore, any procedural error was harmless.

## B

The Takings Clause provides that "'private property' shall not 'be taken for public use, without just compensation.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting U.S. Const. amend. V); *see also Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 238–39 (1897) (incorporating the Takings Clause to the States through the Fourteenth Amendment). To state a claim under the Takings Clause, a plaintiff must establish the following: (1) the plaintiff must own "private property" as contemplated under the Takings Clause; (2) that private property must be taken for "public use"; and (3) the taking entity must not have paid "just compensation" for it. Ultimately, the second district judge correctly concluded that the right to attend a "free common school" is not "property" as that term is understood under the Takings Clause. Accordingly, Appellants' claim fails at the first "step" of the takings analysis, and we affirm the grant of summary judgment.

## i

"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'"

*Phillips*, 524 U.S. at 164 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "But state law cannot be the only source." *Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023). Courts must "also look to 'traditional property law principles,' plus historical practice and [the Supreme] Court's precedents." *Id.* (quoting *Phillips*, 524 U.S. at 167).

Appellants argue that Article IX, § 1 of the Idaho Constitution confers in them a property interest to attend a "free common school." That provision provides:

> [t]he stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools.

Idaho Const. Art. IX, § 1.

The Idaho Supreme Court recently commented on this provision in *Gifford v. West Ada Joint School District #2*, 498 P.3d 1206 (Idaho 2021), stating that "[t]his Court has previously recognized that [Article IX, § 1] creates an enforceable, individual right." *Id.* at 1213 (citing *Paulson v. Minidoka Cnty. Sch. Dist.*, 463 P.2d 935 (Idaho 1970)).[5]

---

[5] In *Gifford*, parents sued the defendant school district, arguing that the district's charging of fees for full-day kindergarten (instead of half-day, which was provided for free) violated the free public education provision of Article IX, § 1 of the Idaho Constitution. *Id.* at 1209. More specifically, in their motion for partial summary judgment and class certification, the plaintiffs in *Gifford* "argue[d] that fees for the additional half-day of kindergarten resulted in an unconstitutional taking from those who paid it." *Id.* at 1210. The Idaho trial court denied the

Appellants argue that *Gifford* makes clear that "the Idaho Constitution imposes a duty on the Districts (not just the legislature) to provide Patrons with a 'free common school,' and grants Patrons a corresponding enforceable, individual property right to attend common school *free* of any charges for any 'products received from it.'" They argue that "*Gifford* stands for the proposition that the undisputed allegations in the instant case constitute a basis for denying summary judgment for the Appellee Districts."

The statement in *Gifford* that Article IX, § 1 "creates an enforceable, individual right" may indeed indicate the existence of a legally recognizable property interest. However, this statement is not sufficient to establish that the right at issue—to attend a "free common school"—warrants protection under the Takings Clause. Rather, the proper analysis must examine whether the right is sufficiently "vested" such that it constitutes "private property" under the Takings Clause.

We first consider what "private property" means under the Takings Clause. With respect to claims arising under the

---

motion because it found that the parents lacked standing. *Id.* On appeal, the Idaho Supreme Court reversed this finding and concluded that the parents had sufficiently alleged an educational injury such that they had standing to pursue their claim. *Id.* at 1212. The court's statement that Article IX, § 1 creates "an enforceable, individual right" came in the context of the court's discussion of the parents' allegation of an injury in fact. *Id.* at 1213. In that same discussion, the court "emphasize[d] that [it] express[ed] no opinion on the merits of [the] case," but commented that the parents' prospective arguments "present[ed] thorny legal issues" and that "[w]hichever theory (or theories) Parents intend to advance, they face a significant challenge." *Id.* at 1213–14. Therefore, this statement in *Gifford* does not establish that the Idaho Constitution creates an individually enforceable vested private property right under the Takings Clause.

Takings Clause, the phrase at issue—private property—is given a narrower meaning than in other legal contexts, particularly compared to the Due Process Clause of the Fourteenth Amendment. *See Bowers v. Whitman*, 671 F.3d 905, 912 (9th Cir. 2012) (discussing the difference between "property" under the Due Process Clause versus under the Takings Clause).[6]

"A person's interest in a benefit is a 'property' interest for *due process* purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (emphasis added). Indeed, the Supreme Court has recognized property rights that were constitutionally protected, such that they were safeguarded by *due process*, but still not vested, and thus the government could *take* away these interests so long as it provided proper procedures. *See, e.g.*, *id.*; *Goldberg v. Kelly*, 397 U.S. 254 (1970). But "[a] plaintiff alleging an

---

[6] Other Circuits have more explicitly explained that "property" is narrower under the Takings Clause than it is under the Due Process Clause. For example, in *Pittman v. Chicago Board of Education*, 64 F.3d 1098 (7th Cir. 1995), the Seventh Circuit observed as follows:

> '[P]roperty' as used in [the Takings] clause is defined much more narrowly than in the due process clauses. . . . There is historical warrant for the narrow reading of 'property,' but the more important reason for the narrow reading is practical. If a statutory benefit could not be rescinded without the payment of compensation to the beneficiaries, it would be extremely difficult to amend or repeal statutes.

*Id.* at 1104–05 (cleaned up); *see also Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 285 n.3 (3d Cir. 2008) ("Property as used in the Takings Clause is defined much more narrowly than in the due process clause.") (internal quotation marks omitted).

unconstitutional *taking* of a government benefit . . . must show more than a mere claim of entitlement; there must be some transformation of that claim into a vested property right." *Yancey v. District of Columbia*, 991 F. Supp. 2d 171, 179 (D.D.C. 2013) (emphasis added).[7]

Therefore, to be cognizable under the Takings Clause, a constitutionally protected property right must be vested. *Bowers*, 671 F.3d at 912 (citing *United States v. Sioux Nation*, 448 U.S. 371, 414–15, 424 (1980)); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980). "To determine whether a property interest has vested for Takings Clause purposes, the relevant inquiry is the certainty of one's expectation in the property interest at issue," since the court must determine whether the government could "remove or modify the right without committing a constitutional taking." *Bowers*, 671 F.3d at 913 (internal quotation marks and citation omitted); *see also Right*, *Black's Law Dictionary* (12th ed. 2024) (defining a vested right as "[a] right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent").

"The Supreme Court has required a high threshold of certainty before finding that an entitlement ha[s] vested." *Bowers*, 671 F.3d at 915; *see also Sioux Nation*, 448 U.S. at 414–15, 424 (holding that the government could not enact legislation to take back land it had expressly reserved for the

---

[7] Here, Appellants contend that the first district judge properly relied on *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), when he denied the School Districts' first motion for summary judgment. But as the second district judge correctly observed, "*Roth* was a procedural due process case, and multiple courts have explained that the property interests protected by the Due Process Clause are not coterminous with the property interests protected by the Takings Clause."

Sioux Nation without committing a constitutional taking); *Webb's Fabulous Pharmacies*, 449 U.S. at 164–65 (holding that the state's confiscation of the interest accrued on interpleader funds was a constitutional taking); *Lynch v. United States*, 292 U.S. 571, 576 (1934) (holding that the government could not avoid payment of its commitment to pay disability and life insurance by enacting a statute repealing the laws granting the benefit without committing a constitutional taking). But where there was an insufficient certainty of expectation in the property interest at issue, the Supreme Court has concluded that there could be no taking. *See Bowen v. Gilliard*, 483 U.S. 587, 605 (1987) ("But given the unquestioned premise that the Government has a right to reduce [the relevant] benefits generally, that result does not constitute a taking of private property without just compensation."); *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174 (1980) ("There is no claim here that Congress has taken property in violation of the Fifth Amendment, since railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time.").

A claimed property interest can rise to the level of a vested private property right if it concerns "a 'core' notion of constitutionally protected property into which state regulation simply may not intrude without prompting Takings Clause scrutiny." *Ward v. Ryan*, 623 F.3d 807, 812 (9th Cir. 2010) (quoting *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1200 (9th Cir. 1998)). "Property's core meaning is determined by reference to traditional background principles of property law." *Id.* (internal quotation marks and citation omitted).

Tangible objects such as real and personal property fall within property's core meaning. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 357 (2015). The Supreme Court has

also extended Takings Clause protection to "the group of rights inhering in the citizen's relation to the physical thing, [such] as the right to possess, use and dispose of it." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945). Less commonly, the Supreme Court has extended protections to intangible property interests where they share "many of the characteristics of more tangible forms of property." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002–04 (1984) (holding that a trade secret property right was protected under the Takings Clause); *see also Omnia Com. Co. v. United States*, 261 U.S. 502, 508 (1923) (contract rights protected under the Takings Clause). These essential characteristics of private property, also known as the "bundle" of property rights, include the right to possess, use, exclude, transfer, enjoy, and dispose. *Horne*, 576 U.S. at 361–62.

Public education in Idaho does not fit within this bundle of property rights. The very manner in which public education is provided precludes Appellants from having a private interest in it because what constitutes public education (and therefore what constitutes free public education) can be changed by public entities as a matter of Constitutional right in Idaho.

Public education is a variable product, regulated by a public system; it is not a consistent, standalone "thing," tangible or intangible, over which a student has exclusive dominion. Idaho's Constitution imposes a "duty [on] the legislature of Idaho[] to establish and maintain a general, uniform and thorough system of public, free common schools." Idaho Const. Art. IX, § 1. By its very terms, the Constitution of Idaho does not, on its own, create the public school system—it "is a mandate to the State through the Legislature" to do so. *Thompson v. Engelking*, 537 P.2d 635,

648 (Idaho 1975). For its part, the Idaho Legislature has followed that mandate, by statutorily specifying the constitutionally minimum level of education available in the "thorough system of public schools." Idaho Code § 33-1612(2) (explaining that "[i]n fulfillment of" its duty under the Idaho Constitution, the Legislature has created and supported a thorough system of public schools, and outlining "the basic assumptions that govern provision of" such system). The Idaho Supreme Court has explained that "[a] general and uniform system" of education under the Idaho Constitution is

> one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the 12th grade—a system administered with that degree of uniformity which enables a child to transfer from one district to another within the same grade without substantial loss of credit or standing and with access by each student of whatever grade to acquire those skills and training that are reasonably understood to be fundamental and basic to a sound education.

*Thompson*, 537 P.2d at 652 (citation omitted).[8]

Once created, the system of free common schools is not handed to students and parents for their use, enjoyment, disposal, or control as private property. Instead, the Idaho

---

[8] This "uniformity requirement" was subsequently reaffirmed. *See Idaho Sch. for Equal Educ. Opportunity v. Evans*, 850 P.2d 724, 730–31 (Idaho 1993).

Code sets forth a lengthy statutory scheme governing education within Idaho. The Idaho Legislature has delegated its authority to the state Board of Education to prescribe the basic curriculum:

> (1) The state board shall prescribe the minimum courses to be taught in all public elementary and secondary schools . . . . (2) The board shall determine how and under what rules curricular materials shall be adopted for the public schools . . . . (4) The board of trustees of each school district may adopt their own curricular materials consistent with the provisions of section 33-512A, Idaho Code. Curricular materials adopted must be consistent with Idaho content standards as established by the state board of education.

Idaho Code § 33-118. Furthermore, Article IX, § 2 of the Idaho Constitution explicitly contemplates plenary local supervision, regulation, and governance of public schools by local school boards:

> The general supervision of the state educational institutions and public school system of the state of Idaho, shall be vested in a state board of education, the membership, powers and duties of which shall be prescribed by law. The state

> superintendent of public instruction shall be
> ex officio member of said board.

Idaho Const. Art. IX, § 2. And the Supreme Court of Idaho has recognized that under this system, the Legislature must establish and maintain a system of common schools, while "the Board sets educational policy for the state and holds the authority of 'general supervision' over the state educational institutions and public school systems, while the Superintendent carries out the day-to-day 'policies, procedures and duties authorized by law or established by the state board of education.'" *Ybarra v. Legislature by Bedke*, 466 P.3d 421, 431 (Idaho 2020) (citing Idaho Const. Art. IX, § 2; Idaho Code § 33-125). Consequently, what comprises educational services in one district or county might be different from another.

The state Board of Education has adopted administrative rules defining the "constitutionally minimum" standards of education by, for example, defining the "core of instruction" and setting forth the basic instructional courses required for graduation in Idaho. Notably, the minimum standards provided for in these rules do not include any of the specific educational benefits Appellants allege are guaranteed to them by the Idaho Constitution. All fees levied were "optional fee[s]," fees for "extracurricular activities," fees for items purchased, or "pass-through fee[s]" directly associated with the cost of optional courses.

Local school districts are also statutorily empowered to create extracurricular course offerings beyond the minimum

standards. The board of trustees of each school district is empowered

> [t]o supervise and regulate, including by contract with established entities, those extracurricular activities that are by definition outside of or in addition to the regular academic courses or curriculum of a public school, and which extracurricular activities shall not be considered to be a property, liberty or contract right of any student, and such extracurricular activities shall not be deemed a necessary element of a public school education but shall be considered to be a privilege.

Idaho Code § 33-512(12). The Idaho Supreme Court has explained that a levy or fee for educational offerings beyond the minimum standards

> imposed generally on all students whether they participate in extra-curricular activities or not, becomes a charge on attendance at the school. Such a charge contravenes the constitutional mandate that the school be free. But it should be noted that, because social and extra-curricular activities are not necessary elements of a [common] school career, the constitution does not prohibit . . . [the] setting [of] fees to cover costs of such activities to be paid by students who wish to exercise an option to participate in them.

*Paulson*, 463 P.2d at 938.

Finally, what constitutes public education itself is subject to change as a matter of constitutional right, which is fundamentally incompatible with private ownership. As explained above, the minimum standards of quality for schooling are proscribed by the board of education, subject to revision by the Idaho Legislature. And the standards are not immutable; the required minimum standards can be (and have been) altered, modified, or even abolished.[9] Unilateral changes to the standards necessarily alter what students can potentially expect from their public schooling experiences, meaning that students lack private dominion over public education. It follows that Appellants lack private dominion over the specific contours of educational benefits that must be free under the Idaho Constitution.

Against this statutory and regulatory backdrop, we conclude that a public education in Idaho lacks the essential "bundle" of private property characteristics. *See Horne*, 576 U.S. at 361–62. At bottom, neither students nor their parents can possess, use, dispose of, or sell their interest in free

---

[9] Examples of governmental changes to Idaho's education system include mandating instruction in cursive handwriting (Clark Corbin, *State Board advances cursive rule*, Idaho Educ. News (August 15, 2013), available at https://perma.cc/4YC3-UP2U); enlarging the age range within the definition of "school age" to six to twenty-one years (from six to eighteen) and clarifying that only persons aged seven to sixteen are required to attend school (Idaho Code §§ 33-201–02 (1963)); making kindergarten optional (Idaho Code § 33-208 (1975)); banning the teaching of critical race theory in public schools (James Dawson, *Idaho Governor Signs Bill to Ban Critical Race Theory in Schools*, NPR (May 1, 2021), available at https://perma.cc/T6M5-B3TA); and removing the obligation that public schools teach about climate change (Livia Albeck-Ripka, *Idaho Stripped Climate Change From School Guidelines. Now, It's a Battle.*, N.Y. Times (Feb. 6, 2018), available at https://perma.cc/P2WT-H3PG).

public education in Idaho, which means that an interest in a free public education is not sufficiently vested to be subject to the Takings Clause.

ii

Appellants try to evade the conclusion that they lack a vested private property interest under the Idaho Constitution by insisting that the above rationale misapprehends their claim. They argue that through this suit, they "do not grieve the Districts' unlawful *denial* of education to their children. [The students] received all the education they desired. Rather, they protest the government's confiscation of their *money* for a public education plainly required by Idaho law to be provided free of charge." No such misapprehension has occurred.

As examined above, Appellants cannot be understood to possess a vested private property interest in attending free common schools because a right to free public education does not resemble traditional notions of property and because public education is under the control of the Idaho Legislature and the school board. Any right to be free from "confiscation of their money for a public education" is intertwined with the right to education set forth in the Idaho Constitution. As such, whether or not a fee can properly be assessed by the School Districts depends on whether the fee is charged for something within the minimum educational requirements promulgated by the Legislature and the board.[10] Thus, any right to money fails for the precise reasons outlined above.

---

[10] Said another way, fees cannot be charged for anything legislatively defined to be within the minimum educational requirements. If the Legislature amends the definition of "public education" by, for example,

Further, the freeness of the educational right attaches to the minimum standards, not to all possible educational opportunities a School District could elect to provide. As the Idaho Supreme Court explained in *Paulson*, a fee for educational opportunities "in addition to the regular academic courses of curriculum . . . imposed generally on all students[,]" regardless of whether they participate in such activity, "becomes a charge on attendance at the school" in contravention of the Idaho Constitution. 463 P.2d at 938. But where such activities "are not necessary elements of a [common] school career, the constitution does not prohibit . . . [the] setting [of] fees to cover costs of such activities to be paid by students who wish to exercise an option to participate in them." *Id.* Consistent with this principle, if an Idahoan can receive for free an education consistent with the minimum standards dictated by the Legislature and the board of education, the constitutional obligation has been met.

Nor can Appellants establish a constitutional taking of their money, independent of any connection to the educational system. A property interest in money alone is generally not cognizable under the Takings Clause. *See E. Enters. v. Apfel*, 524 U.S. 498, 540 (1998) (Kennedy, J., concurring in the judgment and dissenting in part). However, money alone can give rise to a cognizable property interest for the purposes of the Takings Clause in limited circumstances—for example, where the property interest is in a *specific fund*, as in the interest or principal of an identified account. *See Webb's Fabulous Pharmacies*,

---

removing math as an element of public education, schools may then properly charge fees to students who choose to take math class, so long as the fees are reasonably tied to the provision of the math class.

449 U.S. at 160–65 (holding that there was a taking where a court appropriated interest earned on the principal in an interpleader account); *Fowler v. Guerin*, 899 F.3d 1112, 1117–18 (9th Cir. 2018) (relying on Supreme Court precedent indicating that "the interest income generated by funds held in [trust] accounts is the 'private property' of the owner of the principal," and holding that the account holders possessed a vested property right in the money (quoting *Phillips*, 524 U.S. at 172)). Money can also be subject to a taking when the government "seizes ownership of liens . . . ; demands that one pay a debt owed to a third party to the state itself; or seizes money without a court order." *Ballinger v. City of Oakland*, 24 F.4th 1287, 1296 (9th Cir. 2022) (citations omitted). Distinguishing each of those situations from the one at issue here is that "[t]he money in all those cases was taken from known persons in the form of a specific, identified property interest to which those persons were already entitled." *Id.* (citation omitted).

Aside from these situations, "the mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause of the Fifth Amendment." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc). For example, in *Ballinger*, we considered whether there had been a taking where a municipal ordinance required landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment. 24 F.4th at 1291. We determined that "the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest." *Id.* at 1292. We also noted that because "[t]he Ordinance 'merely impose[s] an obligation on a party to pay money on the happening of a contingency,' which

happens to be related to a real property interest, but does not 'seize a sum of money from a specific fund," the payment of fees could not constitute an unconstitutional taking. *Id.* at 1294 (quoting *McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2010)). Here, like in *Ballinger*, a fee was charged "on the happening of a contingency"—Appellants' election to enroll in certain optional courses with associated fees. As such, the present scenario lacks the direct governmental appropriation of a specific, vested monetary interest necessary to give rise to a per se monetary takings claim.

Nor is the payment of the fees at issue here an unconstitutional exaction. Under an exactions theory, "any government action, including administrative and legislative, that conditionally grants a benefit, such as a permit [on the condition that the claimant pay a monetary fee], can supply the basis for an exaction claim rather than a basic takings claim." *Id.* at 1299 (citing *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 140 (2021)). "[T]he 'starting point to our analysis' of exactions claims is still whether the substance of the condition, such as granting an easement"—or here, the provision of specific educational and extracurricular services—"would be a taking independent of the conditioned benefit." *Id.* at 1300 (quoting *Cedar Point Nursery*, 594 U.S. at 151). As was the case in *Ballinger*, because the payment at issue here is not a compensable taking, it does not constitute an exaction. *Id.*

To be sure, "the obligation to pay money in the tax and government services user fee context is not generally compensable under the Fifth Amendment because taxes and user fees are collected in exchange for government benefits to the payor." *Id.* at 1296; *see also id.* at 1297 (concluding that the relocation fee at issue there was a "monetary

obligation triggered by a property owner's actions" and collecting cases from other circuits where obligations to pay money were held to not be takings); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 615–16 (2013) (collecting cases distinguishing taxes and user fees from money that can be "taken"). For example, in *United States v. Sperry Corporation*, the Supreme Court held that "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services." 493 U.S. 52, 63 (1989). There, the plaintiff was awarded a $2.8 million settlement, payment of which was to be made from $1 billion of Iranian assets held in a Security Account at the Bank of England. *Id.* at 56–57. However, when the award was paid through the Federal Reserve Bank of New York, Congress mandated a 1.5 percent deduction to cover U.S. government expenses related to arbitration and account maintenance. *Id.* The Supreme Court concluded that this was not a taking, but rather, it was merely a user fee since the deduction was to reimburse the cost of the government's services and was not excessively high to be considered more than a user fee.[11] *Id.* at 62–63.

Accordingly, the fees charged to Appellants do not amount to an exaction. The School Districts have certified that each of the fees charged bears a reasonable estimation of the costs of providing the related benefit (*e.g.*, paying for travel for band, or teaching specialized classes that require materials beyond those required in a general course). The Idaho Supreme Court has explained that these costs should

---

[11] In *Sperry*, the Court noted that while fees cannot be excessively high to be considered user fees, such fees need not match the service benefits precisely. *Id.* at 62–63. They should, however, fairly approximate the service costs. *Id.*

not be imposed "generally on all students whether they participate in [such] activates or not." *Paulson*, 463 P.2d at 938. They are instead more equitably paid "by students who wish to exercise an option to participate in them." *Id.* Overall, we conclude that Appellants lack a property interest in the money spent to satisfy fees related to supplemental educational services.

iii

Even if Appellants did possess a vested private property interest, summary judgment was still appropriate because Appellants cannot allege that such property (their money) was taken for public use. The fees did not benefit the "public" because they were directly tied to the conferral of specific benefits extended to Appellants in exchange for the fee. *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); *Kelo v. City of New London*, 545 U.S. 469, 484 (2005) (explaining that a development plan "satisf[ied] the public use requirement of the Fifth Amendment" where the "plan unquestionably serve[d] a public purpose").

*          *          *

We hold that when deciding whether to revisit a previous decision by a predecessor judge, district judges should explicitly consider whether any of the three circumstances laid out in *Delta Savings Bank* are applicable before proceeding to reconsider the previous decision.

We further hold that here, Appellants do not possess a vested property interest in the right to attend a "free common school." The payment of fees to the School Districts in

exchange for specific educational benefits—which were pursued at Appellants' discretion—therefore does not constitute a taking.

**AFFIRMED.**